[No. 31288.  Department Two.  January 4, 1951.]

HENRY HEWITT et al., Appellants, v. JOHN HEWITT et al., Respondents.[1]

Henderson, Carnahan & Thompson, for appellants.

Metzger, Blair, Gardner & Boldt, for respondents.

HAMLEY, J.—The question presented is more factual than legal:  Did the plaintiffs establish a cause of action?  The trial court answered in the negative and entered an order of dismissal.  The plaintiffs appeal.

The principal litigants are brothers, John and Henry Hewitt.  We shall refer to them by their first names, and as though they were the only parties.

The name Hewitt has long been a familiar one in Tacoma. The father of John and Henry organized the Hewitt Land

[1]Reported in 226 P. (2d) 198.

Company. The two brothers succeeded him in the owner-ship and management of it. The depression of the 1930's reduced them from affluence to somewhat straitened circum-stances. We find them, at the beginning of this almost fan-tastic episode (which concerns a timber bonanza in which an $85,000 investment netted more than $1,500,000), carry-ing on their business from a single desk in a 10' by 10' room in a Tacoma office building. They were principally engaged in negotiating timber deals on a commission basis. Some-times they worked together and sometimes separately, and it is admitted that there was no general partnership.

March 6, 1942, Dan Calkins, a long-time personal friend of Henry's, came into their office and exhibited to the brothers a list of timberlands in Douglas county, Oregon, which he stated might present an opportunity for profit. This initiated a chain of events which, for John, led on, if not to fame, at least to fortune.

John secured additional information by correspondence. It developed that the timberlands were tax-title properties owned by Douglas county, Oregon, consisting of about a hundred parcels in sizes varying from forty acres to a sec-tion, and totaling almost twenty thousand acres, scattered over ten or twelve townships. Within the month (March 27, 1942), a letter addressed to John was received from the authorities of Douglas county stating that this timberland could be purchased for ninety thousand dollars. The letter stated further that, although no option was being granted, the county would not enter into negotiations for the sale of the property to any other parties for a period of sixty days, thus allowing time for an inspection of the properties.

In the meantime, Paul Barber became interested in the possibilities in these timberlands. He had worked for the Hewitt Land Company as an accountant and was acquainted with both brothers. Barber, in turn, had contacted and interested John A. Markham. (To avoid confusion, inas-much as we are referring to John Hewitt as John, we will refer to John A. Markham as Markham.)

It was decided that John should proceed to Oregon and

inspect the timber. Before leaving for Oregon, John wrote and signed the following letter to Calkins:

"I have a letter from the Commissioners of Douglas County Oregon wherein they have agreed, for a purchase price of $90,000.00 to give me a Q C Deed to what is known as the old Neenah-Oregon Timber Co. lands, which they claim was acquired by tax foreclosure.

"You and Henry Hewitt and I have undetermined shares in this option or right to buy or whatever it is and it may be that we will have to share these equities with others who may do the work in acquiring these lands and who may put up the funds for doing so.

"The right to acquire these lands expires on May 27th 1942, in the meantime I expect to look over these properties and if they are not worth while purchasing we will know soon and if we decide they are worth while purchasing we will then have a meeting and all agree how we are to apportion these interests."

The letter was co-signed by Henry and, in a corner of it is written, "Accepted D. D. Calkins." As of that time, the letter epitomized the situation; they had "undetermined shares in this option or right to buy or whatever it is." The apportioning of the interests of the parties depended, of necessity, upon future developments, particularly upon the terms which could be made with those "who may put up the funds."

John established a camp site and spent forty days inspecting many of the scattered parcels. He testified that he had received eighty-five dollars from Henry and fifty dollars from Barber for expenses while making this examination, and that he spent some five hundred dollars.

Shortly before the end of the sixty-day period, Henry and Barber joined John at his camp and spent about three days inspecting various parcels. The three of them then went to the county seat of Douglas county and secured an oral agreement to extend the time within which they might purchase, provided they would make a payment of two hundred fifty dollars. They returned to the camp and had a discussion which lasted far into the next morning, with Henry leaving the meeting in anger. He returned home

that day, and John and Barber remained for a further examination of the timberlands.

The versions of what transpired at that meeting are divergent, but they all agree that there was discussion as to what share each of the parties was to take in the venture. It is conceded that John at all times insisted that he would take twenty-five per cent. Henry admits that he considered taking as much as fifteen per cent. He testified, "I could probably have forced my wife to dig up that 15%."

There is no doubt that Henry could have had a fifteen per cent interest at that time, had he desired it and been able to finance it. As of that date, Markham had agreed to put up forty per cent of the amount required and, on satisfactory security, to carry John for another twenty-five per cent. Barber testified that, at that time, Henry could have had fifteen per cent because he, Barber, was not particularly concerned about the percentage he would take. It was also made clear that there were to be no "free rides," and that anyone who came in on the venture would have to pay his share.

It seems fair to conclude from the testimony and from letters written at a later date, that Henry was angry because they were buying the timberland, when he had envisioned a sale on the basis of an option and a quick profit without any investment; and he was further disgusted at his brother's insistence on twenty-five per cent, when, as he phrased it, John "couldn't have dug up a cracked dime." Henry also ridiculed the idea that John could put up any security which would be satisfactory to Markham.

Despite Henry's low opinion of John's cash and credit standing, the latter did acquire, through Markham's assistance, a twenty-five per cent interest, for which John later paid in full. It is a share in this twenty-five per cent of the one million five hundred thousand dollars realized or to be realized from the sale of this timberland that Henry seeks by the present proceeding, on the theory of a joint adventure.

To continue the chronological narrative: Following the meeting at which the brothers so violently disagreed, Barber

paid Douglas county the two hundred fifty dollars (for two hundred dollars of which he was reimbursed, fifty dollars by each of the Hewitts and one hundred dollars by Markham) which had been agreed upon as the consideration for an extension agreement. The extension agreement was in the form of a letter from Douglas county dated May 28, 1942, addressed, as the original letter had been, to John Hewitt. It gave another ninety days during which "Douglas County, Oregon will not enter into negotiations with any other party or parties for the sale and purchase of said timber property," and gave John the first right and privilege to purchase "upon such terms and conditions as may hereafter be agreed upon."

Letters written in June and August of 1942 by Henry to John, indicate, as does the testimony, that Henry never favored the idea of actually purchasing this property, and from the very beginning was looking for a quick turnover to get some money to live on. We quote from the letters referred to:

"Yes! Markham will help you to take care of your share if you put up the security. Well! If you had the proper kind of security you could get it at the bank. I wish you would try Reno and you will get a rude awakening. Your [sic] not even getting money to buy something. It would merely be a first payment and banks do not loan money for people to speculate with.

"Come out of the skies and co-operate as was the understanding when we started this thing. Do You Mean to Say You Would Turn Down Possibly a Clean Cut Profit of Anywhere from $5,000.00 to $20,000.00— Our original understanding was to get this tied up and then unload and apparently days passing by dont mean anything to you. We have got to get action and Quit dreaming." (Letter of June 6, 1942.)

"First: We will assign all our right title and interest to the above mentioned tract of County timber land to you and your associates for the sum of $1,500.00 to be paid to each of us making a total of $3,000.00 within ten days from date. Or,

"Second: We will agree to take ten (10%) percent interest in the same (five percent to each of us) which interest is to be carried by you and your associates. This agreement to

take said 10% interest is conditioned upon our being given an exclusive option on said timber lands; a complete description of said timber lands shall be set out in said option; for a period of 90 days at a price of $150,000.00 and if a sale is made within said time and even though it may be consummated at a later date then Henry Hewitt and D. D. Calkins shall have 20% each of the net profits accruing from said sale. It being understood that if a higher price than $150,000.00 can be secured then such higher price shall accrue to the benefit of all parties concerned." (Letter of August 17, 1942.)

The contract of purchase was prepared September 2, 1942, and thereby Douglas county agreed to sell the timberlands to Markham and Barber for a total price of $85,075.35, with one-fifth, or $17,015.07 to be paid in cash and the balance in six annual installments of $11,243.38 plus interest. Markham put up seventy per cent of the down payment and Barber thirty per cent.

On that same day John wrote to Henry enclosing a copy of the contract and saying:

"We haggled over the terms for several days principally because the county did not want to give a deed to parcels as we pd for them but wanted full amount pd before any deeds. So we compromised by paying an extra dollar per  and of course anything pd at any time applies on the purchase price. In addition to this contract we are getting letters from the county giving us rights of ways across other co. lands and agreeing to reimburse us for any land & timber pd for and which their contract and deeds were not good any such failure is remote. I am composing a trust agreement to submit to Paul & John & told Paul I would be home shortly and as I understand it:

| | | | | | |
|---|---|---|---|---|---|
| "Paul | carries | Calkins for | 5% | of 1st payt. | |
| Markham | " | Henry " | 5% | " | " |
| Markham | " | John " | 25% | " | " |
| Paul | | | 25% | " | " |
| Markham | | | 40% | " | " |
| | | | 100% | | |

"Paul & Markham seem inclined to consider giving an option to reliable purchasers but think $200,000. should be the figures. I do not want to because I have seen much more of the tract now, particularly about 1000 acres near Pickett

Butte in Town 30S-125 and I am literally amazed at what I saw."

There was, as of the date of the contract (September 2, 1942), a full disclosure of how the interests were being allocated and of the price that was being paid. True, John did not tell Henry how he proposed to finance the twenty-five per cent he was taking, but he was under no obligation to do so. He did tell Henry that he was "literally amazed" at what he had seen, and consequently did not want to sell, even for two hundred thousand dollars. Henry and Calkins never availed themselves of the right to take up their respective five per cent interests.

Although Henry, in his brief, refers to this as an "outrageous disposal" of his interest, and a "pro rating made without his knowledge and consent," we fail to see that he has any cause for complaint. An effort had been made to get from him a commitment as to what interest he would take. He admitted that in May of 1942 he had considered fifteen per cent, and probably could have persuaded his wife to pay for it. John testified that sometimes Henry wanted five per cent and sometimes ten per cent, and that the final understanding was that he could handle only five per cent.

In any event, by September 2, 1942, the opportunity to make a quick profit without any investment was at an end; the original joint adventure had tried to sell what it called an option, but without success. The original commitment from Douglas county and its ninety-day extension had expired, and the time had arrived when only money would "talk." Markham and Barber put up seventeen thousand dollars cash and obligated themselves for sixty-eight thousand dollars more. Markham and Barber never became members of the original joint adventure, for, as Barber said in a letter of June 11, 1942, neither he nor Markham was interested in "a profit sharing agreement unless the other fellow wants to put up something too." With their purchase of the property, the control of the situation passed into the hands of Markham and Barber. Thereafter, if the members of the original joint adventure desired to remain

in the picture, it had to be on a basis agreeable to the men who had contracted to buy the timberlands.

Henry and Calkins were offered an opportunity to participate in the new venture, and failed to avail themselves of it. It appears that Henry actually made some effort to take up his share. He testified that on December 28, 1942, in an effort to secure Markham's aid in financing him, he suggested that he had some collateral, but that Markham manifested no interest.

■ Henry failed to establish any participation in the joint adventure which acquired the timber and sold it.

Nor is there any basis for a contention by Henry that there was a breach of a fiduciary relationship on the part of John. There was no concealment of John's intention to take a twenty-five per cent interest; it was thoroughly understood, and his ability to finance it was made the subject of verbal and written ridicule. He repeatedly urged Henry to take a substantial interest. If Henry had been denied any proportion he had desired because of John's insistence of twenty-five per cent, there might be a legitimate basis of complaint. However, Henry cannot now claim an interest in that portion of this venture for which John pledged his credit and ultimately paid, with no detriment to Henry. See *Shrader v. Downing,* 79 Wash. 476, 140 Pac. 558, 52 L. R. A. (N.S.) 389; *Bringgold v. Stucky,* 162 Minn. 343, 202 N. W. 739.

John Hewitt wrote a letter to Paul Barber, dated December 17, 1945, upon which appellants place great emphasis. We quote it in its entirety:

"I will have to write this all down in answer to your comment about John's [Markham's] query, pleasantly listened to by you, as to if Henry and Calkins might take $1500.00 each for their equities in the Oregon Tract. I would not carry such a message to them, it would be next to unholy for me to do so. It is extremely distressing to even dwell upon the thing but I must say this much more:

"At the time the trade was made, you and John [Markham] did make the 20% down payment but neither was fully sensible that he had a hold on a million dollars worth of property, so no risk really existed which would entitle

you to so much and Henry and Calkins to so little considera-
tion.

"It seems like each person in the group, either in thought
or words, has depreciated what the other members did in
order to acquire this property. Contrary to this is the blunt
fact that had not Henry been part of the Hewitt Office,
Calkins would never have come within range of me, even
with a list of lands he knew nothing about. However, I
shooed him aside and then got the option myself and with
the help of you and John [Markham] we were soon in pos-
session of a priceless contract. That is the true chain of
events and each party did much when measured by the
results and had anyone been missing, then truly, our op-
portunity would never have come into being.

"I will write in this paragraph although it may encroach
on whimsy, it's like this. Calkins and wife are members and
high up in the Church of Christ Scientist, likewise is Henry's
Hilda, all resulting in a close relationship between them, else
there would never have been a knock at my door, however
it came, was forthwith relayed to you and via you to John
[Markham].

"Calkins is living on borrowed time, Henry is part way
through the twilight of life, both are old men. What a
tragedy should their equities be plucked away from them
at this late hour in life. We all know you took a 25% interest
for yourself, as I did, then you took an additional 5% for
Calkins. John [Markham] was sensible to the fact that an
undetermined share for Henry was in his hands, confirmed
by his long ago letter wherein he so cruelly thrust Henry
aside. Let Calkins and Henry pay you and John [Mark-
ham] and let them have their respective 5% and 10% of the
distributions, which may be done without disturbing the
ownership as it now stands.

"To ask them to take $1,500.00 or so, each, for their
equities in an $800,000.00 surplus is an injustice to them and
a sentence for them to continue on with their cramped lives.

"They did their part, Calkins blundered unconsciously on
to this opportunity, came to Henry who had wits enough to
keep him from peddling it elsewhere, this comes almost be-
ing their last chance in an existence become somewhat color-
less at this late hour for both of them. Please ignore the fact
that they defaulted in paying, if for this reason only, that
it was known to both of you that they could not possibly pay
for their shares when the amounts were due.

"This letter is about the limit of my embassy. I am bold
enough to say that you and John [Markham] do not need

any Hewitts to aid you but if Henry and his friend get their proportions alloted to them in some way, you may find that in these coming years we may produce a repeater which may require your help again. Let's not rear a monster that will head off such a consummation."

This letter admits that both Calkins and Henry had participated in making possible this timberland transaction, and that the writer felt strongly that they should have a just share in the then estimated profits of eight hundred thousand dollars. It looks as though conscience and perhaps the spirit of the Christmas season prompted his suggestions that Barber should give Calkins five per cent and Markham should give Henry ten per cent, but there is not the slightest suggestion that Henry or Calkins had any interest in his, John's, twenty-five per cent in the venture.

We, too, write in the Christmas season; but, however much we might like to use John's plenty to alleviate Henry's "cramped life," we are none the less constrained to hold with the trial court that Henry has established no cause of action entitling him to share therein. The case is *sui generis*, and the precedents are of little value. Suffice it to say that the original adventure did not accomplish its purpose of tying up the timberlands and selling them at a quick profit; and that Henry did not take advantage of his opportunity to become a member of the second adventure, which actually acquired and sold the timberlands. To use the vernacular, John caught the boat, and Henry missed it.

The reader should perhaps be advised that Barber did pay Calkins fifteen thousand dollars for any interest he might have, and Markham paid Henry twenty-eight thousand dollars for a release of all claims against Markham personally. This has nothing to do with the question of whether Henry was entitled to share in John's twenty-five per cent interest, but it serves to leave a somewhat brighter picture than does John's letter of December 17, 1945.

The judgment of dismissal is affirmed.

SIMPSON, C. J., ROBINSON, MALLERY, and HILL, JJ., concur.

February 9, 1951. Petition for rehearing denied.